UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

SHAWNNA THIBODEAU,

                Plaintiff,

    -against-

PINNACLE FX INVESTMENTS, RAZOR FX, INC.,
DEXTER BELL, ROLAND FRANCIS and
MICHAEL RICHARD MACCAULL,

                Defendants.
------------------------------------------------------------X

**08** CV **1662** ( )

BIANCO, J.

LINDSAY, M.J.

**COMPLAINT**

JURY TRIAL DEMANDED

FILED
U.S DISTRICT COURT E.D.N.Y.
★ APR 22 2008 ★
BROOKLYN OFFICE

    Plaintiff, by her undersigned attorneys, Conway & Conway, allege for her complaint against Defendants Pinnacle FX Investments ("Pinnacle"), Razor FX, Inc. ("Razor"), Dexter Bell ("Mr. Bell"), Roland Francis ("Mr. Francis") and Michael Richard MacCaull ("Mr. MacCaull") as follows:

### PRELIMINARY STATEMENT

1.     This case is brought by an investor, Ms. Shawnna Thibodeau ("Ms. Thibodeau" or "Plaintiff"), who was scammed out of approximately $70,000 by Defendants.

2.     Ms. Thibodeau was introduced to Pinnacle through her friend, who held an account with them. Impressed with her friend's purported trading success with Pinnacle, and relying on the assurance of Pinnacle's principal Mr. Bell, Ms. Thibodeau gave Pinnacle money with which to invest in the foreign exchange market ("FOREX").

3.     Ms. Thibodeau's investment was never used to trade in FOREX as promised by Pinnacle. Instead, and unbeknownst to Plaintiff, Pinnacle transferred Ms. Thibodeau's money to Razor FX to "invest." Pinnacle never performed any due diligence or investigation on Razor before they transferred Ms. Thibodeau's money to them. This money was never used by either

Pinnacle or Razor to trade in FOREX, but rather went straight into Razor's bank accounts and, upon information and belief, into Pinnacle's bank accounts as well.

4.      Defendants also generated false account statements that showed non-existent profits in Ms. Thibodeau's account.

5.      Razor and its principal, Mr. MacCaull, operated a Ponzi scheme in which it was fraudulently represented that the money was to be invested in FOREX, when in fact the money was deposited in their own bank accounts.  Significantly, Mr. MacCaull was arrested and plead guilty to an alleged foreign exchange scam that took in at least $68,000,000.

6.      This Complaint arises out of, among other things, material misrepresentations and omissions regarding Plaintiff's investments and Defendants' conversion of those funds in violation of, among other things, state and federal securities laws.  As a result of Defendants' actions, Plaintiff has collectively been caused to suffer economic loss in an amount not less than $70,000.

I.      THE PARTIES

7.      Plaintiff Shawnna Thibodeau, is a resident of New York City in the State of New York.

8.      Defendant Pinnacle FX Investments is a purported "professional money management group" that "works alongside the two top foreign exchange management companies in the United States."  See Printout from website www.pfxinvestments.com attached hereto as Exhibit A.  Pinnacle is located at 1685 H Street, #1031, Blaine, Washington, 98230-5107.

9.      Upon information and belief, Defendant Dexter Bell is a resident of the State of Washington and is one of the principals of Pinnacle.  At all relevant times hereto, Mr. Bell held

2

himself out to the public and to Plaintiff as, inter alia, an experienced investment advisor and trader.

10.   Upon information and belief, Defendant Roland Francis is a <u>resident</u> of the State of Washington and is one of the principals of Pinnacle.  At all relevant times hereto held himself out to the public and Plaintiff as, inter alia, an experienced investment advisor and trader and "Forex Fund Manager."

11.   Defendant Razor FX, Inc. held itself out as a financial services firm in the business of trading in the foreign exchange market.  Razor FX maintained offices at various times at 1010 Northern Boulevard, Great Neck, New York, 11021.

12.   Upon information and belief, Defendant Michael Richard MacCaull is a resident of the State of New York.  At all relevant times hereto held himself out to the public and Plaintiff as, inter alia, an experienced investment advisor and trader.

13.   Defendants are sued, individually and as aiders and abettors, co-conspirators or controlling persons, and the liability of each arises from the fact that each engaged in, knew of, or had reason to know of, participated in, substantially assisted all or part of the unlawful acts complained of, or failed to act in light of a duty to act, has acted willfully, wantonly, and maliciously and in bad faith, or has directly or indirectly induced the wrongful acts of persons over whom each exercised control and supervision.

II.   JURISDICTION, VENUE AND JURY DEMAND

14.   This Court has jurisdiction over this action and the subject matter hereof pursuant to 28 U.S.C. § 1331 and under principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

3

15.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

16.     Personal jurisdiction over defendants is based on Article 3 of New York's CPLR and/or upon the provisions of instruments described herein.

17.     Plaintiff hereby demands a jury trial.

### III.   FACTS

18.     Ms. Thibodeau, age 32, has been a stuntwoman for the past 12 years.  She performs stunt work, such as car crashes and building jumps, primarily for movies but also for television.  While her job requires that she travel extensively for the majority of the year, Ms. Thibodeau has been a resident of New York for the past 13 years.

19.     Due to the long hours, strenuous work, and isolation from family and friends while on location, the community of stunt people is a close knit one.  While on location in Los Angeles in 2007, Ms. Thibodeau met Chris Gordon ("Mr. Gordon"), a fellow stuntman.  Ms. Thibodeau and Mr. Gordon were part of the core stunt team of the film "Hancock" and doubled the lead actors.  They worked with each other approximately six to seven days per week for five months.  As a result, Ms. Thibodeau and Mr. Gordon became good friends.

20.     Even though she had no investment experience, Ms. Thibodeau had always been interested in investing her money and had been reading books on the subject.  Like her, Mr. Gordon was also interested in investing and they would often discuss issues of finance.

21.     Ms. Thibodeau and Mr. Gordon were interested in investing their money because of the instability of their stunt profession.  Injury could quickly demolish a career.  Aging and weight gain, especially for a female stunt person, could lead to termination.  In addition, a stunt career is also inconsistent with pregnancy and motherhood.  As the majority of stunt people have

4

no work experience other than stunt work, the awful reality is that they have difficulty in obtaining other employment if and when they are unfortunately injured or fired. As such, the stunt person community views their current paychecks as their last paycheck, therefore they invest their money in order to make it grow and provide them with some security for the future. As Ms. Thibodeau wanted to start a family, she needed to make her money now and invest it for the future.

22. Like most stunt people, Ms. Thibodeau too was always concerned with the instability of her career and with providing herself with some security and, as such, wished to invest some of hard-earned savings.

23. While discussing investments and finance, Mr. Gordon explained to Ms. Thibodeau that a number of stunt people from Vancouver, Canada, invested their money with Pinnacle. He told her that Mr. Bell, who was the principal of Pinnacle, invested money for a number of entertainers and that he himself had invested with Pinnacle for the past year.

24. Mr. Gordon showed Ms. Thibodeau his account statements online and explained to her that he was invested in FOREX through Pinnacle. Mr. Gordon's account statements at that time showed that he was making gains in his investments with Pinnacle.

25. Because Mr. Gordon was a cautious and frugal man, Ms. Thibodeau trusted his judgment and believed that if she also invested in Pinnacle, she would receive returns that would provide for a more secure future.

26. In early August 2007, Ms. Thibodeau spoke with Mr. Bell, the principal of Pinnacle. He explained to her that investing in FOREX would be "lucrative" and that most people could not invest in it because they did not meet the monetary requirements. He explained that what he and Pinnacle did was to pool all his investors' money, such as all the stunt people's

5

money, and give it to a foreign exchange management company to invest. He indicated that he had a "good friend" at one of these foreign exchange management companies that he knew for "years" and completely trusted. He explained that because of his relationship with his "good friend" he was allowed to pool investors' money and invest it as if it was one big investor.

27.     Mr. Bell also explained that Pinnacle implemented software that would monitor her account and alert them if her account was losing money so that they could mitigate her losses. This software would be monitoring her account 24 hours per day, seven days per week.

28.     Mr. Bell also indicated that investment through Pinnacle was exclusive and that even though she did not meet their "qualifications," he would take her on as a client anyway.

29.     Due to the combination of assurances and representations from Mr. Bell, as well as the returns shown to her by Mr. Gordon, Ms. Thibodeau decided to invest her hard-earned money with Pinnacle.

30.     Ms. Thibodeau opened an account with Pinnacle in September 2007 and invested $70,000 with them, which represented approximately 35% of her net worth.

31.     Ms. Thibodeau never received hard copies of account statements. Rather, she would log on to the Pinnacle website every week and check her account balances.

32.     As of November 2007, her account grew to $74,594.93  As of January 2008, her account grew to $78,808.63. See Account Statements attached hereto as Exhibit B.

33.     In or around mid January 2008, Ms. Thibodeau received a telephone call from a Mr. Bell of Pinnacle. He inquired if she heard about the "scam" and wanted to tell her that he "had nothing to do with it." He explained that "money was stolen" and "everything was lost." Ms. Thibodeau did not understand to what Mr. Bell was referring until Mr. Bell clarified that he

gave his investors' money to Razor, even though he "did not know who the people [Razor] were."

34.     Ms. Thibodeau, shocked and sickened by what she was hearing, confronted Mr. Bell about the entity to whom he entrusted her money. She stated that she thought Mr. Bell was investing her money through his good, trusted friend, as he represented to her and as he represented on Pinnacle's website. Mr. Bell indicated that his "good" friend was at Pardo Capital, but that the money was invested through Razor instead. Mr. Bell again stated that he did not know anyone at Razor. Interestingly, he was unable to explain to Ms. Thibodeau why he invested her money through Razor, an entity he apparently did not know, versus investing the money through his good friend at Pardo Capital, which he represented he would do in his initial conversation with Ms. Thibodeau.

35.     By way of context, Mr. MacCaull, one of the principals of Razor, was arrested on mail fraud and wire fraud conspiracy charges and is a defendant in a criminal case that is being prosecuted in the United States District Court, Eastern District of New York. Razor held itself out as a financial services firm in the business of trading in the spot foreign exchange market. Mr. MacCaull defrauded investors in a Ponzi scheme in which he fraudulently represented that he was investing their money in the spot foreign exchange market when in fact he and his partner were depositing the money in their own bank accounts. Mr. MacCaull and his partner sent out false account statements to the investors reporting non-existent trades and profits. When investors sought to withdraw their funds, they were paid from the funds received from other investors. MacCaull and his partner swindled approximately $67,000,000 from investors in 2007 alone. See EDNY Press Release and Amended Affidavit in Support of Application for an Arrest Warrant attached hereto as Exhibit C.

36.     However, Pinnacle is also culpable for the losses in Ms. Thibodeau's account. There is no evdence that Pinnacle performed any due diligence on Razor before entrusting Ms. Thibodeau's money to them to invest in FOREX. Indeed, Mr. Bell touted that he could invest through his "good friend," yet chose to give his investors' monies to Razor, whom he admitted he did not know at all. On their website, Pinnacle misrepresented that the "foreign exchange management companies" with whom they work were "currently members of the NFA (National Futures Association)." Razor was not a member of the NFA and had Pinnacle performed any due diligence or investigation at all, as they represented on their website, the fact of Razor's lack of membership would have been easily discoverable. Indeed, Pinnacle either intentionally conspired with Razor to steal money from their customers' accounts, or Pinnacle was grossly negligent in entrusting customer money to them. Either way, Pinnacle directly contributed to Ms. Thibodeau's losses.[1]

37.     As a result of Defendants' gross misconduct, Ms. Thibodeau lost her entire investment in the amount of $70,000.

## COUNT I
## (VIOLATION OF SECTION 6(B) OF THE COMMODITIES FUTURES EXCHANGE ACT)

38.     Ms. Thibodeau repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "37" as if fully set forth herein.

39.     Defendants violated §6(b)(a)(i) of the Commodities Futures and Exchange Act when they cheated or defrauded or attempted to cheat or defraud Ms. Thibodeau.

---

[1] Furthermore, Pinnacle has blatantly misrepresented themselves to customers, especially Ms. Thibodeau, on their website. For example, Pinnacle claims that it is insured by the FDIC and SIPC. Pinnacle is not insured by either.

40.    Defendants further violated §6(b)(a)(ii) when they willfully made or caused to be made to Ms. Thibodeau any false report or statement thereof, or willfully to enter or cause to be entered for Ms. Thibodeau any false record thereof.

41.    Defendants also violated §6(b)(a)(iii) when they willfully deceived or attempted to deceive Ms. Thibodeau by any means whatsoever in regard to any such order on contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person.

42.    By reason hereof, Ms. Thibodeau has been damaged in an amount not less than $70,000, plus interest, costs, reasonable attorneys' fees and punitive damages.

## COUNT II
### (VIOLATION OF SECTION 6(O) OF THE COMMODITIES FUTURES EXCHANGE ACT)

43.    Ms. Thibodeau repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "42" as if fully set forth herein.

44.    Defendants violated §6(O)(1)(a) of the Commodities Futures and Exchange Act when they employed a device, scheme or artifice to defraud Ms. Thibodeau.

45.    Defendants further violated §6(O)(1)(b) when they engaged in a transaction, practice, or course of business which operated to defraud and deceive Ms. Thibodeau.

46.    By reason hereof, Ms. Thibodeau has been damaged in an amount not less than $70,000[2], plus interest, costs, reasonable attorneys' fees and punitive damages.

## COUNT III
### (BREACH OF FIDUCIARY DUTY)

47.    Ms. Thibodeau repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "46" as if fully set forth herein.

48.    At all times relevant hereto, Defendants had complete control of Ms. Thibodeau's assets that had been provided to them for the purpose of investing in FOREX.

49.    At all times relevant hereto, Defendants owed to Ms. Thibodeau the duty of possessing and exercising the degree of financial and investment knowledge and skill which is generally recognized in the community and to act in the best interests of Ms. Thibodeau.

50.    Ms. Thibodeau trusted and relied upon Defendants to provide financial and investment advice for it with reasonable skill, care and diligence and to act in her best interests.

51.    Defendants, despite their aforementioned duties, provided financial and investment advice on behalf of Ms. Thibodeau in a negligent, careless, and unprofessional manner and failed to protect Ms. Thibodeau 's interests.

52.    In breach of those fiduciary duties, Defendants, among other things: i) lied to Ms. Thibodeau concerning the investment of funds; ii) lied to Ms. Thibodeau concerning holdings of the funds; iii) lied to Ms. Thibodeau concerning the performance of her account; iv) provided Ms. Thibodeau with false and misleading documents; v) converted Ms. Thibodeau's money for their personal use, vi) placed their own interests ahead of Ms. Thibodeau and failed to safeguard her assets.

53.    By reason of Defendants failure to serve Ms. Thibodeau in a proper, skillful, prudent and diligent manner as alleged herein and breach their fiduciary duty directly, Ms. Thibodeau has been damaged in an amount believed to be approximately $70,000, plus interest, costs, reasonable attorneys' fees and punitive damages.

### COUNT IV
### (BREACH OF CONTRACT)

54.    Ms. Thibodeau repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "53" as if fully set forth herein.

10

55.    Defendants contracted and were engaged to provide professional services to Ms. Thibodeau.  Such contracts and engagement required Defendants to perform in a proper, skillful, prudent and diligent manner, and to exercise the degree of care, skill, prudence and diligence which is commonly possessed and exercised by professionals competent to render financial and investment advice.

56.    Ms. Thibodeau fully performed all conditions and obligations of the contractual agreement which Defendants required to be performed by Ms. Thibodeau, and Ms. Thibodeau cooperated fully with Defendants in order to facilitate Defendants rendering of financial and investment advice to her.

57.    Defendants failed to provide financial and investment advice to Ms. Thibodeau in a proper, skillful, prudent and diligent manner, and with the degree of care, skill, prudence and diligence which is commonly possessed by professionals competent to render financial and investment advice.

58.    Defendants failed to observe standards of good faith and fair dealing in handling Ms. Thibodeau's account.

59.    Defendants breached their contract and engagement with Ms. Thibodeau.

60.    By reason hereof, Plaintiff has been damaged in an amount not less than $70,000 plus interest, costs, reasonable attorneys' fees and punitive damages.

## COUNT V
## (NEGLIGENCE)

61.    Ms. Thibodeau repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "60" as if fully set forth herein.

62.     Defendants owed Ms. Thibodeau, at a minimum, a duty of reasonable and ordinary care in their dealing with her, including the care and competence of a reasonable investment broker or advisor.

63.     Defendants have failed to perform the duties of care imposed upon them when they were entrusted with the funds of Ms. Thibodeau, a customer, thereby resulting in damages to her.

64.     Ms. Thibodeau's account was handled in a negligent manner incompatible with its stated investment objectives, the purported professional skill and ability of Defendants and the purported professional competence of Defendants.

65.     As a result of Defendants' actions, Ms. Thibodeau incurred monetary damages.

66.     Defendants were careless and negligent and breached their fiduciary duty to Ms. Thibodeau in managing her FOREX account because among other things, they: i) performed no due diligence or investigation into the entity to whom they were entrusting Ms. Thibodeau's money; ii) provided Ms. Thibodeau with fraudulent account statements; and ii) converted Ms. Thibodeau's funds.

67.     As a proximate result of Defendants' negligence, Ms. Thibodeau has been damaged.

68.     By reason hereof, Ms. Thibodeau has been damaged in the amount of $70,000, plus interest, costs, reasonable attorneys' fees and punitive damages.

## COUNT VI
## (CONVERSION)

69.     Ms. Thibodeau repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "68" as if fully set forth herein.

70.     Ms. Thibodeau entrusted Defendants with funds, which Defendants were to have invested on behalf of Ms. Thibodeau.

71.     However, upon information and belief, Defendants did not actually invest Ms. Thibodeau's funds at all and converted all or a part of her investment funds for their own use.

72.     Defendants have each acted wantonly and in total violation of Ms. Thibodeau's rights.

73.     As a result of the wrongful and intentional conversion of Ms. Thibodeau's investment funds by Defendants, Ms. Thibodeau has sustained damages in the amount of $70,000, plus interest, costs, reasonable attorneys' fees, and punitive damages.

## COUNT VII
## (COMMON LAW FRAUD AND DECEIT)

74.     Ms. Thibodeau repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "73" as if fully set forth herein.

75.     Defendants intentionally made various material misrepresentations concerning Ms. Thibodeau's investment in FOREX.

76.     Defendants misrepresented: i) that the "foreign exchange management companies" with whom they work were "currently members of the NFA (National Futures Association);" ii) that they performed any due diligence or investigation; and iii) that they were insured by the FDIC and SIPC.

77.     Defendants intentionally failed to disclose numerous facts including that they were going to misappropriate Ms. Thibodeau's funds.

78.     Defendants knew of the falsity of their misrepresentations when made, and at the time of making, Defendants knew they were false and made them with the intent of deceiving

13

and defrauding Ms. Thibodeau and of inducing Ms. Thibodeau to transfer its money to Defendants.

79.     Defendants knew that their omissions of material facts concerning Ms. Thibodeau's FOREX account were misleading, in light of the circumstances in which they were made, and contributed to the deception.

80.     Ms. Thibodeau was unaware of the falsity of the representations, believed them to be true and relied upon them.

81.     Defendants, without Ms. Thibodeau's informed consent, wrongfully, intentionally, fraudulently, maliciously, and deceptively manipulated Ms. Thibodeau's account.  Defendants executed such transactions for the purpose of enriching themselves and such conduct was in complete and total disregard for the interests of Ms. Thibodeau.

82.     As a result of Defendants' misrepresentations and omissions, Ms. Thibodeau has suffered economic harm.

83.     In view of the flagrant, wanton and intentionally fraudulent conduct on the part of Defendants, Ms. Thibodeau is entitled to punitive damages in amount to be determined at trial.

84.     By reason hereof, Ms. Thibodeau has been damaged in the amount of $70,000, plus interest, costs, reasonably attorneys' fees, and punitive damages.

**COUNT VIII**
**(NEGLIGENT MISREPRESENTATION)**

85.     Ms. Thibodeau repeats and realleges each and every allegation contained and set forth in paragraphs "1" through "84" as if fully set forth herein.

86.     Defendants were, at a minimum, careless in imparting words upon which Ms. Thibodeau was expected to rely.

87.    Ms. Thibodeau, unaware of the misstatements made Defendants, reasonably relied on the misstatements and misrepresentations of Defendants, Defendants were aware of Ms. Thibodeau's reliance, and Ms. Thibodeau's reliance caused her to act.

88.    Defendants induced Ms. Thibodeau to invest their funds on the basis of false information supplied to Ms. Thibodeau by Defendants.

89.    Defendants were the authors of words expressed directly to Ms. Thibodeau, an individual owed a duty of care by Defendants, with knowledge that the words would be acted upon by Ms. Thibodeau.

90.    As a result of Defendants' misrepresentations and omissions Ms. Thibodeau has suffered economic harm.

91.    By reason hereof, Ms. Thibodeau has been damaged in the amount of $70,000, plus interest, costs, and reasonable attorneys' fees.


WHEREFORE, Ms. Thibodeau demands judgment as follows:

a.    On the First Count, awarding compensatory damages, in an amount to be determined at trial but not less than $70,000;

b.    On the Second Count, awarding compensatory damages, in an amount to be determined at trial but not less than $70,000;

c.    On the Third Count, awarding compensatory damages, in an amount to be determined at trial but not less than $70,000;

d.    On the Fourth Count, awarding compensatory damages, in an amount to be determined at trial but not less than $70,000;

e. On the Fifth Count, awarding compensatory damages, in an amount to be determined at trial but not less than $70,000;

f. On the Sixth Count, awarding compensatory damages, in an amount to be determined at trial but not less than $70,000;

g. On the Seventh Count, awarding compensatory damages, in an amount to be determined at trial but not less than $70,000;

h. On the Eighth Count, awarding compensatory damages, in an amount to be determined at trial but not less than $70,000;

g. As to all Counts, awarding Ms. Thibodeau interest, costs, reasonable attorneys' fees and punitive damages; and

h. As to all Counts, awarding such other and further relief as the Court deems just and fair.

Dated: New York, New York
April 8, 2008

Respectfully submitted,

Kevin P. Conway (KPC 6946)
Conway & Conway
Attorneys for Plaintiffs
1700 Broadway, 31st Floor
New York, New York 10019
Tel: (212) 938-1080

A

Pinnacle FX Investments – Home

Home    Contact us    login

About Us

What is Forex

Profit Calculator

Open an Account

Forex News

Contact Us

Login

Monday, January 28

# About Us

**Pinnacle FX Investments (PFX)** is a professional money management group that works alongside two of the top foreign exchange management companies in the United States. Through these professionally trained and licensed traders, investors have the opportunity to profit from the world's most unique and lucrative market places.

Both American firms have been actively involved with experienced trading for over 15 years and are currently members of the NFA (National Futures Association). Pinnacle FX Investments uses intricate hardware and software technology to maximize their effectiveness and efficiency, enabling them to better serve their client's needs.

These firms primarily deal with clients accounts ranging from tens of thousands to multi-million dollars, we offer another opportunity. Fortunately due to a personal friendship spanning 20 years between the principals of PFX and the American traders, PFX was the exception. PFX was derived to facilitate those who wanted to partake in this experience though were unable to meet the initial capital requirements, while still having the infrastructure in place to accommodate larger accounts.

Pinnacle FX Investments will always put the client first. Our focus is to provide our clients with above average earnings and profits, weekly progress reports, and ultimate quality customer service.

# How Pinnacle FX Investments Works

After a client has decided to invest with Pinnacle FX Investments they must then decide which trading platform they would like to invest in. From there the client must then read and sign a customer agreement form as well as a W8Ben (Canada) or W9 (United States). Once that is completed clients are then asked to send their initial investment either by money order or by bank wire transfer. As soon as the investment is received it is wired off to the foreign exchange traders to begin trading. All capital being transferred to the foreign exchange traders by PFX is insured up to 100,000 by FDIC (only money being sent is insured not money being traded). A confirmation email will be sent notifying and also thank you for investing with PFX. You will also be sent a client login and password to view your activity online.

Clients are emailed once a week with a client progress report which shows the past week's trading results. As well, clients can visit www.pfxinvestments.com to log into their own private account page. Here clients can view their account history, view trading history and change personal information. All personal information is backed by a protected database, so that all of our client's information is secure.

All of the capital invested with PFX is pooled together by platform and is traded simultaneously. When a profit or loss occurs, all clients including PFX are affected the same. With PFX there is no hold on your investments. Clients can withdraw a portion or the entirety of their capital at any point they feel the need.

This website and the information contained within do not constitute an offer or solicitation to purchase or sell securities. Such an offer can be made only by way of an Offering Memorandum. The statements and figures contained herein are based upon information which we deem to be reliable, but we do not warrant or represent that they are complete or accurate. All figures are subject to change. Offering Memorandums are available at the office of Pinnacle FX Investments Limited Partnership.

PFX Investments - Tel / Fax: 1-877-893-1415,  1685 H Street - #1031, Blaine, Washington, USA, 98230-5107

* Design by T.H.Media



**B**

Yahoo!    My Yahoo!    Mail    Tutorials    More    Welcome, **sweetthib** Sign Out    All-New Mail    Help

# YAHOO! MAIL
Classic

Search: [                    ]    **Web Search**


HANDBAGTESTPANEL.COM
FREE* DESIGNER HANDBAG    CLICK HERE
*No purchase necessary, see promotion terms.    KATE SPADE    DOONEY & BOURKE    BURBERRY

Contacts    Calendar    Notepad    **Mail For Mobile** - **Mail Upgrades** - **Options**

**Check Mail**    **Compose**    Search Mail    Search the Web

Netflix
Try for Free!

Previous | Next | Back to Search Results

**Delete**    **Reply**    **Forward**    **Spam**    **Move...**

**Folders**    [Add - Edit]

This message is not flagged. [ Flag Message - Mark as Unread ]    Printable View

**Inbox (5)**

Draft    **Date:**    Wed, 7 Nov 2007 18:43:50 -0800 (PST)

Sent

Bulk    [Empty]    **From:**    "Shawnna Thibodeau" <sweetthib@yahoo.com>    View Contact Details    Add Mobile Alert

Trash    [Empty]    **Subject:**    Shawnna banking investment

**My Folders**    [Hide]    **To:**    Jeff.naghavi@bankofamerica.com

**AVE (10)**

Documents

**Invincibles (3)**

Pinnacle    Do You Yahoo!?

SWAMP    Tired of spam? Yahoo! Mail has the best spam protection around

**Shawnna (3)**    http://mail.yahoo.com

TaberAve

**Todo (3)**    **HTML Attachment** [ Scan and Save to Computer ]

**receipts (6)**    Home  Contact Us  Contact Us    Login

**Search Shortcuts**    PFX Gold Investment Account - gold_shawnna

My Photos    Welcome shawnna. You are now logged in to your client account.

My Attachments

See your credit
score - free    Account Status

Online Degree
Programs    **Account:**    **#77**    **Date Opened:**    **25-Aug-2007**

Free Printable    **Balance:**    **$74,594.93**    **App. Contracts (Margin $7000):**    **10**
Grocery Coupons
    **Total Account Gains: $4,595**    **Total Percent Gain:**    **---**
Top Schools for
Online Degrees

<< Last Week    Week # 44    Next Week >>

| Activity Date | Description | B/S | Open | Close | Credit | Balance |
|---|---|---|---|---|---|---|
| 29-Oct-2007 | Weekly Opening Balance | | | | | $74,594.93 |
| 30-Oct-2007 | EUR/USD FOREX 100K | Buy | 1.4421 | 14416 | ($500.00) | $74,094.93 |
| | Broker Fee | | | | ($300.00) | $73,794.93 |
| 02-Nov-2007 | EUR/USD FOREX 100K | Sell | 1.4491 | 1.448 | $1,100.00 | $74,894.93 |
| | Broker Fee | | | | ($300.00) | $74,594.93 |
| | Total Weekly Gains | | | | $0.00 | |
| 04-Nov-2007 | Weekly Closing Balance | | | | | $74,594.93 |

Withdrawal History

Investment Account Withdrawals (To Date):

| Date | Amount | | Description |
|------|--------|--|-------------|

Deposit History

Investment Account Deposits (To Date):

| Date | Amount | | Description |
|------|--------|--|-------------|
| 03-Sep-2007 | $70,000.00 | | Deposit |

**Logout**

This website and the information contained within do not constitute an offer or solicitation to purchase or sell securities. Such an offer can be made only by way of an Offering Memorandum. The statements and figures contained herein are based upon information which we deem to be reliable, but we do not warrant or represent that they are complete or accurate. All figures are subject to change. Offering Memorandums are available at the office of Pinnacle FX Investments Limited Partnership.

PFX Investments - Tel / Fax: 1-877-893-1415,  1685 H Street - #1031, Blaine, Washington, USA, 98230-5107

* Design by T.H.Media

| Delete | Reply | Forward | Spam | Move... |
|--------|-------|---------|------|---------|

Previous | Next | Search Results                                    Save Message Text | Full Headers

| Check Mail | Compose | | Search Mail | Search the Web |

Copyright © 1994-2008 Yahoo! Inc. All rights reserved. Terms of Service - Copyright/IP Policy - Guidelines
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

Pinnacle FX Investments – Home

1/28/08 10:52 PM

Home   Contact Us   Log in

## PFX Gold Investment Account – gold_shawnna

**Welcome shawnna. You are now logged in to your client account.**

Your account grew **0.47%**, or **$374.93** from January 28, 2008 to February 03, 2008.

| Account: | #77 | Date Opened: | 25-Aug-2007 |
|---|---|---|---|
| Current Balance: | **$78,808.63** | App. Contracts (Margin $7000): | **11** |
| Total Account Gains: | 2008 – $330.00 | Total Percent Gain: | **-28.95%** |

### Weekly Account Gains

Investment Account Details (Select Weeks):

| 2008 | << Last Week | 4 | 05 | Next Week >> | Submit Dates |
|---|---|---|---|---|---|

| Activity Date | Description | B/S | Open | Close | Credit | Balance | % Change |
|---|---|---|---|---|---|---|---|
| | Week Starting Balance | | | | | $78,433.70 | |
| | Week 1 Totals | | | | + $374.93 | $78,808.63 | 0.00% |
| | Chart Totals | | | | + $374.93 | $78,808.63 | 0.00% |

### Withdrawal History Summary

Investment Account Withdrawals (To Date):

| Date | Description | Amount |
|---|---|---|
| | Total | $0.00 |

### Deposit History Summary

Investment Account Deposits (To Date):

| Date | Description | Amount |
|---|---|---|
| Sep 03, 2007 | Deposit | $70,000.00 |
| | Total | $70,000.00 |

### Logout

This website and the information contained within do not constitute an offer or solicitation to purchase or sell securities. Such an offer can be made only by way of an Offering Memorandum. The statements and figures contained herein are based upon information which we deem to be reliable, but we do not warrant or represent that they are complete or accurate. All figures are subject to change. Offering Memorandums are available at the office of Pinnacle FX Investments Limited Partnership.

PFX Investments - Tel / Fax: 1-877-893-1415, 1685 H Street - #1031, Blaine, Washington, USA, 98230-5107

• Design by T.H.Media

C

Eastern District of New York

The United States Attorney's Office

# Eastern District of New York



[Back to Press Releases - Main Page]

United States Attorney's Office
Eastern District of New York

Robert Nardoza
Public Affairs Officer

(718) 254-6323
Robert.Nardoza@usdoj.gov

**FOR IMMEDIATE RELEASE**                **January 15, 2008**

## PRESS RELEASE

### SPOT FOREIGN CURRENCY TRADER ARRESTED FOR RUNNING FRAUDULENT SCHEME

*Fraud Scheme Takes In Approximately $68 Million In 2007*

     **Benton J. Campbell**, United States Attorney for the Eastern District of New York, and **Philip Bartlett**, Acting Postal Inspector-in-Charge, New York Division, announced the arrest today of MICHAEL RICHARD MACCAULL on mail fraud and wire fraud conspiracy charges. The government has also filed seizure warrants for two automobiles which the defendant purchased for more than $245,000. The defendant's initial appearance is scheduled this afternoon before United States Magistrate Judge Ramon E. Reyes, Jr. at the U.S. Courthouse, 225 Cadman Plaza East, Brooklyn, New York.

     According to the complaint, MACCAULL is one of the principals of Razor FX, Inc., which held itself out as a financial services firm in the business of trading in the spot foreign exchange market, and at various times had offices located in Great Neck, New York and Upper Saddle River, New Jersey, and maintained a website at www.razorfx.com. The complaint charges that beginning in 2000, the defendant defrauded hundreds of investors by fraudulently representing that he was investing their money in the spot foreign exchange market, when in fact he and his partner were simply depositing the money in a bank account from which they paid their living expenses, including MACCAULL's residence and an Aston Martin automobile. In order to conceal their scheme from investors, MACCAULL and his partner sent out false account statements to the investors reporting non-existent trades and profits. Whenever investors sought to withdraw funds, they were simply paid from the funds received from other

Case 2:08-cr-00162-JFB-ARL   Document 1-3   Filed 04/22/08   Page 25 of 35 PageID #: 27

investors. As alleged in the complaint, MACCAULL and his partner received
approximately $68 million from investors in 2007 alone.

If convicted, the defendant faces a maximum sentence of 20 years' imprisonment.

The government's case is being prosecuted by Assistant United States Attorneys
Richard T. Faughnan, Cynthia M. Monaco, Kathleen Nandan, and Brendan King.

**The Defendant:**

MICHAEL RICHARD MACCAULL
Age: 36

**M-08-034**

USAO # 2008R00051
RTF:CMM:cmm

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against -

MICHAEL RICHARD MACCAULL,

              Defendant.

- - - - - - - - - - - - - - - - -X

AMENDED
AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
AN ARREST WARRANT

(18 U.S.C. § 1349)

EASTERN DISTRICT OF NEW YORK, SS:

       VINCENT MINECCI, being duly sworn, deposes and says
that he is a Postal Inspector for the United States Postal
Inspection Service ("USPIS"), duly appointed according to law
and acting as such.

       Upon information and belief, in or about and between
February 2000 and the present, both dates being approximate and
inclusive, within the Eastern District of New York and
elsewhere, the defendant MICHAEL RICHARD MACCAULL, together with
others, did knowingly and intentionally conspire to devise a
scheme and artifice to defraud investors in Razor FX, and to
obtain money and property from them, by means of materially
false and fraudulent pretenses, representations and promises,
and for the purpose of executing such scheme and artifice, to

transmit and cause to be transmitted in interstate and foreign commerce writings, signs and signals by means of wire, in violation of Title 18, United States Code, Section 1343, and to cause mail matter to be delivered by the United States Postal Service and by private and commercial interstate carriers, in violation of Title 18, United States Code, Section 1341.

(Title 18, United States Code, Sections 1349).

The source of my information and the grounds for my belief are as follows:[1]

1.    I have been an Inspector with the United States Postal Inspection Service ("USPIS") for approximately 13 years. I am currently assigned to the Hicksville Fraud Team. I have participated in the investigation of this matter, and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents, and conversations I have had with other law enforcement agents and other individuals.

A.    The Spot Foreign Currency Market

2.    The spot foreign exchange market, also known as

---

[1] Because the purpose of this affidavit is merely to establish probable cause, I have not set forth all of the facts and circumstances of which I am aware. Furthermore, where actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated.

the "foreign exchange" or "FX," refers to the purchase and sale

of currencies by traders who typically work at large banks and

financial institutions.  Because there is no central trading

market for world currencies, the FX market operates 24-hours a

day with major trading centers shifting around the globe as

banks open and close.  Traders at large financial institutions

typically operate in teams and specialize in a particular

currency.  A trader will solicit a "bid-ask" or "spread" on the

cost of particular currency versus another currency.  For

example, a trader at Bank A will call the trading desk at Bank B

and ask for the spread on "dollar-yen" to which he will be

quoted two prices: that at which yen can be purchased from Bank

B and that at which yen will be sold by Bank B.  After the

prices are quoted, and within several seconds, the trader at

Bank A must either decline the price quoted or place a trade

with Bank B for either the purchase or sale of the currency.

Traders in the FX market will often makes dozens of trades to

attempt to capitalize on the fluctuations in the price of

currency on a particular day.  A "round trip" refers to the

purchase and sale of a particular currency thus closing an "open

position" in a currency purchased.  Because trading is 24-hours

a day and world currencies fluctuate in response to world

events, traders at major banks will either monitor their open

4

positions when they leave work or will transfer open positions to a trading desk at a bank office located in a part of the world where banks are operating.

3. In the past, brokers acting as middlemen were sometimes employed by currency traders to put together traders selling and purchasing currencies. However, as major banks moved toward a computerized trading system available only to major financial institutions, trading on the foreign exchange market, which is estimated at $1.5 billion, takes place via computer and is heavily dominated by private banks, government-controlled central banks, and other major financial institutions.

B. Razor FX

4. Razor FX held itself out as a financial services firm in the business of trading in the spot foreign exchange market. Razor FX maintained offices at various times at 1010 Northern Boulevard, Great Neck, N.Y. 11021 and 345 Route 17 South, Upper Saddle River, N.J. 07458, and has a website at www.razorfx.net.

5. Confidential Source ("CS") is an individual with whom I have met several times since our first meeting on January 9, 2008. CS told me that he and defendant MICHAEL RICHARD MACCAULL are the principals of Razor FX. CS told me that he and

MACCAULL started a foreign exchange firm called Salmon Chase International Incorporated in approximately 1999. Following MACCAUL's arrest on February 9, 2000, described below, CS and MACCAULL founded Razor FX.

6. According to CS, Razor FX has investors in New York, New Jersey, Florida, California, Oregon, Massachusetts, Hawaii, Canada, the United Kingdom, and Hong Kong among other places.

C. The Defendant

7. On October 28, 2002, the defendant MACCAULL was sentenced by The Honorable Robert W. Sweet, United States District Judge, principally to a term of imprisonment of fifteen months and a three-year term of supervised release, in connection with his involvement in the securities fraud scheme conducted at Sterling Foster, a broker-dealer investment firm that operated as a "boiler room" in which cold callers and aggressive brokers sold house stocks to its investors. On September 17, 2007, an amended judgment was entered following MACCAULL's guilty plea to violating the terms of his supervised release. MACCAULL was sentenced to one day imprisonment and an additional term of supervised release of 18 months. MACCAULL currently resides in Northport, New York, in a luxurious apartment and drives an Aston Martin paid for by CS out of

investor funds.

D.   The Scheme to Defraud Razor FX Investors

8.   CS told me that neither he nor MACCAULL have been trading in the foreign exchange market on behalf of investors; that he prepared fictitious statements detailing profits and losses, minus trading commissions, which he e-mailed to investors; that investors who withdrew funds were simply paid out of money submitted by new investors; that he and MACCAULL afforded themselves salaries and other perks out of the investors' money; and that he and MACCAULL have been defrauding investors of millions of dollars since the inception of the Razor FX scheme.   Specifically, CS told me that except for a small number of trades he and/or MACCAULL placed with two foreign exchange counterparties, no trading has taken place on behalf of investors.   CS also told me that, although most of his communication with investors was conducted via telephone, bank wires, e-mail, and facsimile, Razor FX also received items via mail, including checks, from investors.

9.   CS explained that because of MACCAULL's previous conviction, MACCAULL was barred from operating in the securities industry and that MACCAULL's involvement in Razor FX was concealed from many, but not all, outside parties. Consequently, CS was the signatory on bank accounts and other

paperwork.  CS told me that Razor FX maintained bank accounts at various times at PNC Bank and North Fork Bank.  I have confirmed with North Fork Bank that Razor FX maintains a bank account with that institution.  Account information provided by North Fork Bank indicates that approximately $68 million dollars has been deposited, mostly via wire transfer, into that account since it was opened in February 2007.

10.  At the request of law enforcement, CS agreed to surreptitiously record a telephone conversation with MACCAULL during which CS and MACCAULL would discuss the scheme to defraud Razor FX investors.[2]

11.  On January 10, 2008, CS spoke with MACCAULL via telephone and I recorded the call.  In that call, CS told MACCAULL that the fund is facing a call for $10 million by the end of next week and that insufficient funds were available to meet that cash call.  MACCAULL asked CS if the investor "wanted it in play," meaning that the money could be traded all week before it was provided to the investor.  When CS replied in the affirmative, MACCAULL told CS that they should just "squash" the account, meaning book false losses to demonstrate a lack of funds in the account to meet the cash call.

---

2 I have summarized the conversations and extracted the quotations noted below from a review of the recordings of the conversations, which I can provide to the Court.  A transcript has not yet been prepared.

8

12. CS offered resistance and eventually told
MACCAULL that "the only way this is going to end up is with the
two of us in jail and I got [CS's wife] and the kids sitting on
the sidelines," to which MACCAULL replied, "This sucks."

13. MACCAULL stressed that the only solution was to
"squash everybody this week" so that "the money is gone" and to
send out statements on Monday showing "everybody at zero." At
another point in the conversation, MACCAULL said they needed to
"handle what they can handle right now" and then "squash" the
accounts as they had done five times before.

14. At another point in the conversation, MACCAULL
referenced the possibility of flight, promising CS that, if "it
comes down to it," because MACCAULL wasn't "the kind of guy that
runs," he would say CS knew nothing about the trades. MACCAULL
said that because CS has kids, CS "can't go anywhere" and "can't
run" so MACCAULL would accept all the blame.

15. In reference to CS's suggestion that they turn
themselves in to authorities, MACCAULL told CS that turning
himself in would just reduce his sentence by one year and that
he and MACCAULL weren't looking at "fifteen months." CS then
asked MACCAULL what he estimated they were looking at, and
MACCAULL estimated that he and CS were looking at "seven years."
MACCAULL also said that a lot of the investors were evading

taxes and "they," meaning law enforcement, would scrutinize this. MACCAULL summed up his position as: "Admitting gets you nothing."

16.   In response to CS asking how they could defend a case, MACCAULL said "you can't," and added, "but how can we defend the other five times we squashed the accounts?"

17.   MACCAULL admitted at several points in the conversation his personal responsibility for the scheme, acknowledging at one point that "we never traded" and at another point recalling only a short period during which he and CS had traded.

18.   On January 12, 2008, CS met with MACCAULL at 1010 Northern Boulevard.  That meeting was videotaped and recorded by me and other Postal Inspectors.  CS and MACCAULL discussed the details of how they would handle money coming into and out of Razor FX, how they would go about "squashing" the accounts, what false trading data to book into investor statements, and what CS should say to a major investor seeking the return of his investment.  MACCAULL cautioned CS to "reduce as much of the collateral damage as you can."  MACCAULL also assured CS that he would take responsibility for the losses because "the shit's gonna get dug up."

WHEREFORE, I respectfully request that an arrest warrant be issued so that the defendant MICHAEL RICHARD MACCAULL may be dealt with according to law.

Inspector Vincent Minecci
United States Postal Service

Sworn to before me this
15th day of January 2008

THE HONORABLE RAMON REYES
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK